UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LYNN ANN HAWKINS, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | No.  4:13-cv-00729-JRA |
| *v.* | ) | |
| | ) | Judge John R. Adams |
| COMMUNITY LEGAL AID SERVICES, | ) | |
| INC. and STANDARD INSURANCE | ) | |
| COMPANY | ) | **ORDER** |
| | ) | |
| *Defendants* | ) | |
| | ) | |

The Plaintiff, Lynn Ann Hawkins ("Hawkins"), seeks to recover long-term disability benefits under an employee welfare benefit plan ("Plan") issued by Defendant Standard Insurance Company ("Standard") to Hawkins' former employer, Community Legal Aid Services, Inc. ("CLAS"), pursuant to 29 U.S.C. §1132(a)(1)(B).  (Answer to Compl., Doc. 15, ¶¶ 1, 5, 10). Standard filed an Answer to the Complaint and then submitted a Motion for Judgment on the Administrative Record. (Answer to Compl., Doc. 15; Mot. For Judgmt., Doc. 25).  Hawkins filed a Reply to the Motion for Judgment, attaching exhibits. (Reply, Doc. 26).  Standard then filed a Motion to Strike Exhibits attached to Hawkins' reply brief. (Mot. For Strike Exhibits, Doc. 28). The Motion to Strike is unopposed.

After consideration of the briefs and the administrative record, the Court hereby GRANTS Standard's Motion for Judgment on the Administrative Record and DISMISSES Hawkins' Complaint.  The Court finds as follows:

## Jurisdiction and the Standard of Review

1.      The Court has jurisdiction over the parties and over the subject matter of the Complaint pursuant to 29 U.S.C. §§1132(e), and 28 U.S.C. §1331.  (Answer to Compl., Doc. 15, ¶ 2).  Venue is proper in the Northern District of Ohio pursuant to 29 U.S.C. §§1132(e)(2) and 28 U.S.C. §1391.

2.      In adjudicating a claim for benefits under an ERISA plan, the court enters judgment on the Administrative Record and summary judgment procedures do not apply.  See *Niswonger v. Liberty Life Assur. Co. of Boston*, No. 3:12-cv-374, 2013 WL 5566661, at *1 (S.D. Ohio Oct. 9, 2013) ("The Sixth Circuit has directed that claims regarding the denial of ERISA benefits are to be resolved using motions for judgment on the administrative record.") (citing *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998)).

3.      The Plan's Allocation of Authority grants broad discretionary authority to Standard.  Specifically, the Plan confers Standard with full discretion and "exclusive authority" to determine eligibility for and entitlement to benefits, administer claims, and to interpret the Plan's terms.  The Plan specifies that Standard's decisions are "conclusive and binding." (000324).

4.      Courts consistently have held that the same Allocation of Authority provision grants full discretionary authority to Standard.  See *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009); *Black v. Long Term Disability Ins.*, 582 F.3d 738, 744 (7th Cir. 2009); *White v. Standard Ins. Co.*, 895 F.Supp.2d 817, 840-841 (E.D. Mich. 2012), *aff'd*, 529 Fed.Appx. 547 (6th Cir. 2013).

5.      When, as here, the plan contains a clear grant of discretionary authority, the administrator's benefit decision is reviewed by the Court under the "arbitrary and capricious"

2

standard of review.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Balmert v.*

*Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010).

6.      The arbitrary and capricious standard "is the least demanding form of judicial

review of administrative action."  *White v. Standard Ins. Co*., 529 Fed.Appx. 547, 551 (6th Cir.

2013) (quoting *Judge v. Metro. Life Ins. Co*., 710 F.3d 651, 658 (6th Cir. 2013)).  "When it is

possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that

outcome is not arbitrary or capricious."  *Schwalm v. Guardian Life Ins. Co. of Am*., 626 F.3d

299, 308 (6th Cir. 2010) (quoting *Shields v. Reader's Digest Ass'n, Inc.,* 331 F.3d 536, 541 (6th

Cir. 2003)).

### Applicable Provisions of the Plan

7.      The Plan provides that the Own Occupation Definition of Disability applies

during the first 24 months for which benefits are payable.  (00305).[1]

8.      The Plan's Own Occupation Definition of Disability provides,

> You are Disabled from your Own Occupation if, as a result of Physical Disease,
> Injury, Pregnancy or Mental Disorder:
>
> 1. You are unable to perform with reasonable continuity the Material Duties
>    of your Own Occupation; and
>
> 2. You suffer a loss of at least 20% in your Indexed Predisability Earnings
>    when working in your Own Occupation.
>
> …
>
> Own Occupation means any employment, business, trade, profession, calling or
> vocation that involves Material Duties of the same general character as the
> occupation you are regularly performing for your Employer when Disability
> begins.  In determining your Own Occupation, we are not limited to looking at the
> way you perform your job for your Employer, but we may also look at the way
> the occupation is generally performed in the national economy.  If your Own
> Occupation involves the rendering of professional services and you are required

---

[1]  Citations to "(00___)" are to the last 5 digits in the Bates numbered Administrative Record, filed as
ECF Doc. Nos. 22-1 and 22-2.

to have a professional or occupational license in order to work, your Own Occupation is as broad as the scope of your license.

Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted.  In no event will we consider working an average of more than 40 hours per week to be a Material Duty.

(00310-311).

9.      After 24 months, the Plan's Any Occupation Definition of Disability applies.

(00305).  The Plan's Any Occupation Definition of Disability provides, in part, "You are Disabled from all occupations if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of Any Occupation."  (00311).

10.      The Plan's Proof Of Loss provision provides,

Proof Of Loss means written proof that you are Disabled and entitled to LTD Benefits.  Proof Of Loss must be provided at your expense.

For claims of Disability due to conditions other than Mental Disorders, we may require proof of physical impairment that results from anatomical or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

(00322).

11.      The Plan's Care Of A Physician provision provides,

You must be under the ongoing care of a Physician in the appropriate specialty as determined by us during the Benefit Waiting Period.  No LTD Benefits will be paid for any period of Disability when you are not under the ongoing care of a Physician in the appropriate specialty as determined by us.

(00321).  The Plan defines Physician as "a licensed M.D. or D.O., acting within the scope of the license."  (00326).

4

12.     The Plan's Allocation of Authority provision provides,

Except for those functions which the Group Policy specifically reserves to the
Policyholder or Employer, we have full and exclusive authority to control and
manage the Group Policy, to administer claims, and to interpret the Group Policy
and resolve all questions arising in the administration, interpretation, and
application of the Group Policy.

Our authority includes, but is not limited to:

    1.  The right to resolve all matters when a review has been requested;

    2.  The right to establish and enforce rules and procedures for the
       administration of the Group Policy and any claim under it;

    3.  The right to determine:

        a.  Eligibility for insurance;
        b.  Entitlement to benefits;
        c.  The amount of benefits payable; and
        d.  The sufficiency and the amount of information we may reasonably
          require to determine a., b., or c., above.

Subject to the review procedures of the Group Policy, any decision we make in
the exercise of our authority is conclusive and binding.

(00325).

13.     The Plan's provision for When Your Insurance Ends provides,

Your insurance ends automatically on the earliest of:

    1.  The date the last period ends for which a premium contribution was made
       for your insurance.

    2.  The date the Group Policy terminates.

    3.  The date your employment terminates.

    4.  The date you cease to be a Member.  However, your insurance will be
       continued during the following periods when you are absent from Active
       Work, unless it ends under any of the above.

        a.  During the first 90 days of a temporary or indefinite administrative or
          involuntary leave of absence or sick leave, provided your Employer is
          paying you at least the same Predisability Earnings paid to you

immediately before you ceased to be a Member.  A period when you are absent from Active Work as part of a severance or other employment termination agreement is not a leave of absence, even if you are receiving the same Predisability Earnings.

    b.  During a leave of absence if continuation of your insurance under the Group Policy is required by a state-mandated family or medical leave act or law.

    c.  During any other temporary leave of absence approved by your Employer in advance and in writing and scheduled to last 30 days or less.  A period of Disability is not a leave of absence.

    d.  During the Benefit Waiting Period.

(00309).

14.    The Plan's definition of Member provides,

Member means:

    1.  A regular employee of the Employer;

    2.  Actively At Work at least 25 hours each week (for purposes of the Member definition, Actively At Work will include regularly scheduled days off, holidays, or vacation days, so long as the person is capable of Active Work on those days); and

    3.  A citizen or resident of the United States or Canada.

(00305).

15.    The Plan's Insuring Clause provides "If you become Disabled while insured under the Group Policy, we will pay LTD Benefits according to the terms of the Group Policy after we receive Proof of Loss satisfactory to us."  (00307).

**Standard Approves Hawkins' Disability Claim for a Closed Period of Time**

16.    Hawkins worked as a legal assistant for Community Legal Aid Services, Inc. ("CLAS") beginning in 1978.  (00270, 00277).  As a benefit of her employment with CLAS, Hawkins obtained long term disability coverage under the Plan.  (00277).

17.    On April 16, 2012, Hawkins temporarily stopped working for CLAS.  (00270). She submitted a claim for long-term disability benefits to Standard, including a Long Term

6

Disability Benefits Employee's Statement ("Employee's Statement") dated May 13, 2012. (00270-272). In her Employee's Statement, Hawkins listed her "Last full day at work" and "Date you became unable to work at your occupation as a result of disability" as April 16, 2012. Hawkins listed her "illness" as "Neck pain, dizziness, numb left," first noticed "4-16-12" and "Arm & fingers, tremors," first noticed "4-16-12." (00270). Hawkins marked that she had "the same condition or a related illness" previously in August 2004. (00270).

18.     On her Employee's Statement, Hawkins stated that her job title was "Legal Assistant." She described her work duties as: "I work at a computer and I do Bankruptcies & Social Security. I also file, answer phones, & appointments w/ clients. File at courthouses and certified mail to post office." (00270).

19.     CLAS's job description for "Legal Assistant" includes "assists in the provision of comprehensive high quality legal services to eligible clients in civil cases…. Examples of particular tasks which may be performed include but are not limited to eligibility screening, interviewing clients, notarizing documents, gathering documents, conveying individualized information and / or advice, making community or legal referrals, filing papers with various courts, … preparation of routine pleadings and letters[,] […] answering telephones, word processing, data entry, office filing, [and] distribution and opening of mail…." (00289).

20.     Standard consulted Certified Rehabilitation counselor, Jack Reynolds, who evaluated the vocational information submitted by Hawkins and CLAS, and determined that Hawkins' occupation of Legal Assistant is classified as Sedentary as defined by the Department of Labor Dictionary of Occupational Titles. (00286-287).

21.     A Sedentary strength level is defined by the Department of Labor Dictionary of Occupational Titles as involving "Exerting up to 10 pounds of force occasionally [up to 1/3 of

the time] and/or a negligible amount of force frequently [1/3 to 2/3 of the time] to lift, carry, push, pull or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met."  (00208, 00286-287).

22.    Hawkins' family physician, Dr. Armand L. Minotti, submitted a Long Term Disability Insurance Attending Physician's Statement ("APS") dated May 1, 2012.  (00185-186). Dr. Minotti listed Hawkins' primary diagnosis as "Fibromyalgia" and a secondary diagnosis of "Cervicalgia."  (00185).

23.    In response to the question "When do you expect a fundamental or marked change in patient's condition?" Dr. Minotti marked "Condition expected to improve" on "6-4-12."  (00186).  Dr. Minotti also noted that he anticipated Hawkins would be able to return to work on June 4, 2012.  (00186).

24.    In a telephone conference with Standard on May 12, 2012, Hawkins described her current condition and status as involving dizziness, aches and pains in her neck, and being off balance.  (00267).  Hawkins informed Standard that she hoped to return to work on June 4, 2012. (00267).  She stated that she would be seeing Dr. Ronald Yarab, Jr., for physical therapy on May 24, 2012.  (00267).

25.    Standard notified Hawkins, by letter dated May 24, 2012, that it was approving her claim until June 3, 2012, at which time her claim would close.  (00024-27).  In the May 24, 2012 letter, Standard stated that the Benefit Waiting Period ended on May 15, 2012, and that it would pay her benefits in the amount of $1,467.79 for the period from May 16, 2012 through June 3, 2012.  (00024).  Standard stated "The most current information we have indicates that

8

you will be returning to work on June 04, 2012.  Therefore, your claim for LTD benefits will be closed with our payment to you through June 03, 2012." (00024).  In the May 24, 2012 letter, Standard informed Hawkins of her right to a review of its decision.  (00026).

26.     On June 4, 2012, Hawkins returned to work full-time as a legal assistant at CLAS. (00182, 00243).

### Hawkins' Subsequent Disability Claim

27.     On July 13, 2012, Hawkins stopped working again.  (00252, 00262).  When Hawkins stopped working, she was no longer a Member as defined by the Plan, and her coverage terminated.  (00305, 00309).

28.     On July 16, 2012, Hawkins sent Standard an email stating that she had stopped working and was seeking payment of additional disability benefits under the Plan.  (00262-263). Standard informed Hawkins that in order to support her claim she would need to provide a completed medical questionnaire by her treating physician and medical records from June 1, 2012 to the present.  (00262).

29.     Hawkins submitted a "Physician's Report - Musculoskeletal" signed by Dr. Minotti, dated July 23, 2012.  (00147-149).  On the Physician's Report, Dr. Minotti listed Hawkins' primary diagnosis as "Myalgia" with secondary diagnoses of "Cervicalgia" and "Depression/Anxiety."  (00147).

30.     On the Physician's Report, in response to the question "Individual can use hands for repetitive, frequent or occasional action such as: …Finger Dexterity (example: typing)," Dr. Minotti marked "yes."  (00148).  Dr. Minotti also marked "yes" for the same question with regards to using the hands for "Simple Grasping," "Pushing/Pulling," and "Fine Manipulation." (00148).  On the Physician's Report, Dr. Minotti marked that Hawkins could "frequently" (34%-

9

66% of the time) sit.  Dr. Minotti marked that Hawkins could "occasionally" (up to 33% of the time) stand, walk, balance, bend ("stooping"), walk on uneven surfaces, reach at shoulder level, reach above shoulder level, drive a manual car, drive an automatic car, and lift, carry, and push or pull 1-10 pounds.  (00148).

31.    Standard obtained Hawkins' medical records from Dr. Minotti's practice at Prima Health Care, LLC; Ronald Yarab, Jr., M.D.; and otolaryngologist, Michael Pascolini, D.O. (00131-181).

32.    Hawkins saw Dr. Yarab for physical therapy on May 3, May 8, and May 24, 2012.  (00144-145, 00170-171).

33.    In a May 24, 2012 Progress Note, Dr. Yarab noted that Hawkins reported that "she is doing somewhat better, but she still has some pain and difficulty.  She notes soreness in the neck area." (00144).  Dr. Yarab noted "Plan: She is to continue her home exercise program. The patient will follow up as needed."  (00144).

34.    There are no treatment records from Dr. Yarab after May 24, 2012.  (00144-145, 00170-171).

35.    Hawkins' medical records from Prima Health Care included records of Hawkins' office visits with Dr. Minotti on April 17, April 26, May 1, and June 2, 2012; forms signed by Dr. Minotti related to Hawkins' absences from work; and a May 20, 2012 letter from Dr. Paul Bartos describing his one-time evaluation of Hawkins in connection with Hawkins' request for leave under the Family Medical Leave Act ("FMLA").  (00150-168, 00172-181).

36.    In the April 26, 2012 record of Dr. Minotti's clinical examination of Hawkins, Dr. Minotti noted "Dec[reased] Cerv[ical] Spine [range of motion] 50%."  (00157-158).  Dr. Minotti also signed a "Certification of Fitness For Duty" form for Hawkins on April 26, 2012, stating

that Hawkins should not return to work at this time, and "This patient will be able to return to work on 6-4-12."  (00165).  In addition, Dr. Minotti signed a form titled "Certification of Health Care Provider for Employee's Serious Health Condition (Family Medical Leave Act)," related to Hawkins' request for leave under the FMLA, in which he estimated her "period of incapacity" as lasting from April 16 to June 4, 2012.  (00160-163).

37.     In the June 2, 2012 record of Dr. Minotti's clinical examination of Hawkins, Dr. Minotti noted "Feel[s] better…in [therapy]."  (00172).  With regards to Hawkins' musculoskeletal exam, Dr. Minotti noted only "Normal gait."  (00173).  Dr. Minotti also signed a "Work Excuse" note for Hawkins on June 2, 2012, which states in its entirety: "Please excuse the above patient from work from 04/16/2012 to 06/03/2012 due to medical problems.  Lynn may return to work on Monday, June 4, 2012."  (00175).

38.     There are no records of treatment by Dr. Minotti after June 2, 2012.  (00150-168, 00172-181, 00081-100, 00133).

39.     Dr. Minotti signed a "Work Excuse" note for Hawkins dated July 23, 2012, which states in its entirety: "Please excuse the above patient from work from 07/16/2012 until further notice due to illness."  (00133).

40.     The records from Prima Health Care included a letter dated May 20, 2012 to CLAS from Dr. Paul Bartos regarding his one-time evaluation of Hawkins on May 17, 2012, in connection with Hawkins' request for leave under the FMLA.  (00178-181).  In the May 20, 2012 letter, Dr. Bartos noted that Hawkins had "normal gait.  Strength in the upper extremities was equal and physiologic.  Deep tendon reflexes in all four extremities were normal."  (00180).  Dr. Bartos noted "She was evaluated for various [fibromyalgia] trigger points showing none at the occiput.  There were trigger points in the anterior neck and scapular area, as well as upper

chest.  There were also trigger points posterior neck bilaterally and infrascapularly.  There were

no trigger points regarding her knees, hips, or thigh." (00180).  Dr. Bartos noted that Hawkins

had "chronic pain syndromes" and "generalized aches and pains." (00180).

41.    Hawkins saw otolaryngologist, Dr. Pascolini, on August 14, 2012. (00135).  In

his August 14, 2012 New Patient/Consultation Form, Dr. Pascolini noted that Hawkins

complained of "dizziness," and recommended videonystagmography ("VNG") testing and

"[follow up] [after] testing." (00135).

42.    VNG testing of Hawkins was performed on August 21, 2012, under the direction

of Dr. Pascolini. (00137-141).  In the report of the VNG testing, Dr. Pascolini noted "Patient

reported taking a muscle relaxer a few hours prior to testing for neck muscle spasms.  Muscle

relaxers effect the central nervous system and can suppress responses to the following tasks."

(00137).  Dr. Pascolini noted "Abnormal saccade and tracking results and square wave eye

movement patter[n]s are central findings.  Nystagmus was observed for head shake testing and is

a peripheral finding; however, testing showing stronger evidence of central involvement.

Clinical correlation is recommended." (00137).  In an August 22, 2012 note reviewing the VNG

testing, Dr. Pascolini noted "Suggest neurology [follow up]." (00136).  There are no records of

any neurology or other follow up.

**Standard's Evaluation of Hawkins' Disability Claim**

43.    Standard consulted with Dr. Richard Handelsman, Board certified in Internal

Medicine, to evaluate Hawkins' medical condition. (00122-129).  Dr. Handelsman evaluated

and analyzed all of medical documentation from Prima Health Care and Dr. Minotti, Dr. Yarab,

Dr. Pascolini, and Dr. Bartos. (00122).  In his September 4, 2012 Physician Consultant Memo,

Dr. Handelsman noted that as of June 2, 2012, Hawkins was reporting "feeling better," receiving

psychological treatment, and "was released to return to work." (00123). Dr. Handelsman opined that Hawkins' prognosis was "good," and that "Reasonable limitations and restrictions for the claimant's cervicalgia, as well as myalgias[,] would be no lift, carry, push or pull greater than 10 pounds, no frequent overhead work and no working at unprotected heights or using dangerous machinery." (00123-124).

44.     Standard conveyed the same information to Hawkins by email dated September 11, 2012, inviting Hawkins to submit her appeal in writing along with any additional medical documentation. (00245).

45.     Hawkins submitted a written appeal, dated September 12, 2012, of Standard's June 3, 2012 closure of her claim. (00243-244). In her September 12, 2012 appeal, Hawkins described her symptoms before April 16, 2012 as "dizziness, lightheadedness, neck pain accompanied by severe tremors, back pain, pain between the shoulder blades, pain in my left shoulder, pain and numbness down my left arm and numb hands." (00243). Hawkins also stated that she "became severely depressed." (00243). Hawkins stated that she returned to work on June 4, 2012, that her symptoms returned, and that "[o]n July 16, 2012 I again became disabled." (00243).

## Standard's Evaluation of Hawkins' Administrative Appeal

46.     Standard obtained additional records from Dr. Minotti. (00081-100). Standard also obtained records from Kathleen Garchar at PsyCare; and an MRI of the cervical spine performed on August 30, 2012. (00113-115, 00121).

47.     On September 28, 2012, Standard requested that Dr. Minotti's practice, Prima Health Care, provide records of Hawkins' treatment from January 2012 through the present. (00077). On October 26, 2012, Standard received in response records of Hawkins' office visits

13

at Prima Health Care on April 17, April 26, May 1, and June 2, 2012, as well as records of

Hawkins' office visits at Prima Health Care on January 20, February 8, and March 17, 2012, the

report of an x-ray performed on January 20, 2012, and the reports of an x-ray and stress test

performed at St. Elizabeth's Health Center on March 8 and March 9, 2012.  (00081-100).  There

were no records of treatment after June 2, 2012.  (00150-168, 00172-181, 00081-100, 00133).

48.      In the January 20, 2012 record of the clinical examination of Hawkins at Prima

Health Care, it was noted that Hawkins complained of "dizziness, pain at base of neck, myalgias,

fatigue."  (00081).  The record of Hawkins' musculoskeletal exam notes "Walks with a normal

gait.  Upper Extremities: Full [range of motion] bilaterally.  Lower Extremities: Full [range of

motion] bilaterally."  (00082).  An x-ray of the chest and sinuses was performed on January 20,

2012 for the indication of "congestion and pain."  (00084).  The radiologist noted "Perhaps

limited left mucosal thickening, otherwise no acute abnormality of the study."  (00084).

49.      In the February 8, 2012 record of the clinical examination of Hawkins at Prima

Health Care, the record of Hawkins' musculoskeletal exam notes "Walks with a normal gait.

Upper Extremities: Full [range of motion] bilaterally.  Lower Extremities: Full [range of motion]

bilaterally."  (00085-86).

50.      Standard obtained the report of an MRI of the cervical spine performed on August

30, 2012, for which Hawkins was referred by Dr. Minotti.  (00121).  In the August 30, 2012

report, the radiologist noted "Please note that the patient moved repeatedly through the exam.

Multiple series were repeated.  Best image set is provided.  The patient moved enough to

misregister the axial to T2 sagittal images."  (00121).  The radiologist noted his impression as:

"Minimal bulge at C3-4. … C4-5 with mild posterior disc protrusion to efface the ventral thecal

sac and accompanied by mild narrowing of the central canal. … Fusion of C5-C6 and C6-7. …

14

Degenerative change at the 1st rib head and facet of C7-T1 that appears to slightly encroach upon the exiting left C8 nerve root.  Correlate clinically." (00121).  The fusion noted by the radiologist was the result of surgery performed in 2004.  (00170, 00270).  There are no records of subsequent treatment or clinical correlation of the MRI findings.

51.      Standard consulted with Janette Green, M.D., Board certified in Internal Medicine, to evaluate Hawkins' medical condition.  (00052-55, 00060-61).  Dr. Green evaluated and analyzed all of the medical documentation from Prima Health Care and Dr. Minotti, St. Elizabeth's Health Center, Dr. Yarab, Dr. Pascolini, and Dr. Bartos.  In her November 27, 2012 Physician Consultant Memo, Dr. Green noted "In approximately April 2012, [Hawkins] presents with complaints of pain and numbness and tingling down her left arm.  Her physical exam and diagnostic studies are generally benign.  She is treated with a course of physical therapy and the last documentation available for our review indicates that her symptoms were improving." (00053).

52.      In her November 27, 2012 Physician Consultant Memo, Dr. Green noted "There is no mention of the claimant being on pain medications of any type, other than the muscle relaxant, certainly no indication that she was using any medication that was giving her significant side effects."  (00053-54).  Dr. Green opined "The documentation available for our review does not support that the claimant had severe neck pain or that she had a radiculopathy." (00054).

53.      In her November 27, 2012 Physician Consultant Memo, Dr. Green noted that the MRI of Hawkins' cervical spine performed in August of 2012 "shows a mild disc protrusion at C4-5 with no evidence of impingement or stenosis and facet degeneration at C7-T1 with a question of a slight encroachment on the nerve root, but again this is questionable. We have no

15

office visit documentation, physical exam or other diagnostic studies done in regard to the

abnormalities seen on this MRI or any of the claimant's complaints."  (00053).

54.     In her November 27, 2012 Physician Consultant Memo, Dr. Green noted,

> There is mention of the claimant having "dizziness;" however, we have minimal
> detail regarding this and no physical exams regarding dizziness.  There is some
> question in regard to the VNG studies to whether the claimant might have a
> central vestibular abnormality, but as previously noted, the claimant's muscle
> relaxant (that she had taken just a few hours before the testing was done) could
> explain the abnormalities seen.  We have no indication that the claimant actually
> followed up with a neurologist and documentation currently available for our
> review does not support any neurological or vestibular abnormality that would
> give limitations and restrictions.

(00054).

55.     Dr. Green also opined that "the documentation available for our review does not

support a diagnosis of fibromyalgia.  We have no physical exams that demonstrate a significant

number of trigger points and the only trigger points noted on any exam are those in association

with her chronic neck pain."  (00054).  Dr. Green opined "The claimant's muscular complaints

and findings are consistent with those of myofascial pain in the neck."  (00054).

56.     Lastly, Dr. Green concluded "The documentation available for our review does

not support limitations and restrictions based on the claimant's cervical myofascial pain that

would preclude her from a full-time sedentary level occupation as of July 14, 2012 and

continuing."  (00055).

57.     In her November 17, 2012 Physician Consultant Memo, Dr. Toenniessen opined

"The very limited mental health clinic records support a diagnosis of adjustment disorder,

although the balance of the diagnostic label is not fully legible.  The primary care physician has

been using depression and anxiety as symptomatic diagnoses.  Both of these framings of the

16

claimant's difficulties are benign and would not indicate work limitations from the diagnoses themselves."  (00065).

58.     Dr. Toenniessen concluded "[Hawkin's] prognosis is good.  She has had symptoms in the past and has been able to work despite those symptoms.  We do not have evidence that the claimant has been too psychiatrically ill to be employed.  Rather, we have evidence that the claimant has some chronic anxiety and low mood that has not prevented employment."  (00066).

59.     In the January 3, 2013 letter, Standard stated,

> The decision to close your claim was upheld and you do have the right to file suit under Section 502(a) of the Employee Retirement Income Security Act (ERISA)….
>
> You are entitled to one independent review of your claim under the terms of the Group Policy.  We completed this review and find we will be unable to extend additional LTD Benefits to you.  The record is now closed.
>
> This concludes the administrative review process by the Administrative Review Unit.

(00209).

### Hawkins' Social Security Exhibits Are Outside the Administrative Record

60.     Under the ERISA "arbitrary and capricious" standard of review, the Court's review is limited to the evidence that was before the administrator at the time it made its decision.  *Schwalm*, 626 F.3d at 308 ("A court may consider only that evidence presented to the plan administrator at the time he or she determined the employee's eligibility in accordance with the plan's terms.  The court's review is thus limited to the administrative record.") (citing *Wilkins*, 150 F.3d at 618); *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 569 n.1 (6th Cir. 2013) ("It is well established that judicial review of an ERISA claim for benefits wrongfully denied is generally limited to the record presented to the plan administrator."); *Judge*, 710 F.3d

17

at 658 ("Our review of the decision of a plan administrator is limited to the administrative

record; that is, we 'are required to consider only the facts known to the plan administrator' at the

time of the decision.") (quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th

Cir. 1996)).  When a claimant fails to submit evidence within the established timeframe, the

claimant is barred from supplementing the administrative record except in limited circumstances

to support a procedural challenge.  See, e.g., *Wilkins*, 150 F.3d at 619 (J. Gilman, concurring).

61.     The Administrative Record closed with Standard's final decision on

administrative appeal, dated January 3, 2013.  (00204-209).  However, in the underlying reply

brief, Hawkins attached her Social Security Notice of Reconsideration, dated July 24, 2013, and

her Social Security appeal documents, signed by Hawkins on August 14, 2013 (collectively

"SSA Documents"), as Exhibits 1 and 2 (Doc. 26).  The SSA Documents were created more than

six months after the Administrative Record closed.  (00209; Docs. 26-1, 26-2); and therefore, the

SSA Documents are not part of the Administrative Record.  (00209; Docs. 26-1, 26-2).

62.     The SSA Documents are outside the Administrative Record and are not submitted

for the limited reason of supporting a procedural challenge.  Therefore, the SSA Documents are

stricken pursuant to Standard's unopposed motion to strike exhibits.  The SSA Documents will

not be considered.  See *Cook v. Hartford Life & Acc. Ins. Co.*, No. 1:10-cv-11809, 2011 WL

722018, at *3 (E.D. Mich. Feb. 23, 2011) ("[T]he Sixth Circuit has held that evidence of a

subsequent award of Social Security disability benefits 'does not fall under the exception to the

rule that federal courts can only consider evidence properly presented to the plan administrator

when reviewing the reasonableness of an ERISA determination.'") (quoting *Storms v. Aetna Life

Ins. Co.*, 156 Fed.Appx. 756, 760 (6th Cir. 2005) (affirming decision to preclude supplementation

of the administrative record with an award of Social Security benefits after the administrative

18

record closed)).  See also *Blajei v. Sedgwick Claims Mgmt. Serv's, Inc.*, 721 F.Supp.2d 584, 598 (E.D. Mich. 2010) (striking plaintiff's exhibit of an SSA letter with a subsequent award of benefits); *Paliczuk v. Unum Life Ins. Co.*, No. 09-10794, 2009 WL 3270489, at *7 (E.D. Mich. Oct. 1, 2009) ("Paliczuk was awarded Social Security benefits after UNUM denied his claim.  As such, evidence of his award was not before UNUM nor may Paliczuk supplement the administrative record with evidence of his award.") (citing *Storms*, 156 Fed.Appx. at 760).

63.     Even if this Court were to consider the exhibits, the SSA Documents support a finding that Hawkins was not disabled prior to May 1, 2013.  Hawkins' Social Security Notice of Reconsideration, dated July 24, 2013, states "The records show that your conditions became disabling as of 5/1/13. … [W]e were unable to find you disabled prior to 5/1/13."  (Doc. 26-1). Hawkins' coverage under the Plan terminated when she ceased to be a Member on July 13, 2012. (00252, 00262, 00305, 00309).  The SSA's finding that Hawkins became disabled under the rules and regulations applicable to the SSA as of May 1, 2013, nearly one year after Hawkins' coverage under the Plan terminated, is not relevant.  See *Likas v. Life Ins. Co. of N. Am.*, 347 Fed.Appx. 162, 167-168 (6th Cir. 2009) ("Because plaintiff must show continuous disability and because coverage ends when a disability ends, any deterioration in health after the date coverage is denied is not relevant.").

64.     The SSA Documents, while not properly before the Court, provide support for the finding that Hawkins was *not* disabled prior to May 1, 2013, and thus support Standard's benefit decision.  (Doc. 26-1).

**Conclusion**

65.    Standard thoroughly evaluated Hawkins' claim and properly exercised its discretionary authority to decline to pay benefits beyond June 3, 2012 based on (i) Hawkins' failure to provide *any* evidence of medical treatment after June 2, 2012, (ii) Dr. Minotti's functional assessment, (iii) the medical opinions of Board certified internists Drs. Handelsman and Green that are consistent with Dr. Minotti's assessment of Hawkins' functional capacity for sedentary work, (iv) the irregularities in the VNG testing and MRI results and the absence of any clinical correlation or validation of the results, (v) the documented improvement in Hawkins' condition in June 2012, (vi) the medical opinions of Board certified psychiatrist Dr. Toenniessen, and (vii) Hawkins' failure to be under the ongoing care of a Physician.

66.    Standard appropriately relied on the weight of the medical evidence, and the accumulation of this data provides a rational basis for Standard's benefit decision.  Standard's determination was the result of a deliberate principled reasoning process and is supported by substantial evidence.  Standard's determination that Hawkins failed to satisfy the Plan's Definition of Disability after her return to work on June 4, 2012, was reasonable and not arbitrary or capricious.  See *Schwalm*, 626 F.3d at 312 ("[T]he evidence suggesting that Schwalm suffered from a continuing disability is not so one-sided that the decision to deny benefits can be considered arbitrary or capricious."); *Morris v. American Electric Power Long-Term Disability Plan*, 399 Fed.Appx. 978, 981 (6th Cir. 2010) ("The ultimate question in any given disability case on 'arbitrary and capricious' review is whether a plan can offer a reasoned explanation, based on the evidence, for its judgment that a claimant was not 'disabled' within the plan's terms.").

67.     The Court hereby finds in favor of Defendant Standard Insurance Company on its Motion for Judgment on the Administrative Record.  As such, Plaintiff Lynne Ann Hawkins' Complaint is hereby DISMISSED.

IT IS SO ORDERED.

Dated: 07/30/2014                              */s/John R. Adams*            
                                               **JOHN R. ADAMS**
                                               **UNITED STATES DISTRICT JUDGE**